**IN DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| FRANCIS E. ENGLISH, | |
| Plaintiff, | |
| vs. | **CV-18-77-GF-BMM** |
| BNSF RAILWAY COMPANY, | |
| Defendant. | **AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER** |

This matter came before the Court for trial without a jury on November 12–20, 2020. Plaintiff Francis E. English ("English") was represented by Erik B. Thueson and Scott L. Peterson. Defendant BNSF Railway Company ("BNSF") was represented at trial by Michelle T. Friend and Benjamin O. Rechtfertig. From the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

**I.      Background**

1.      BNSF employed English as a locomotive conductor from July 4, 2005 to September 14, 2016. He worked out of Havre, Montana. (Doc. 171 at 3).

1

2.      English's employment with BNSF was governed by various agreements collectively bargained by the union that represented conductors. English was a member of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART Transportation Division Union"). SMART TD Local 544, chaired by Local Chairman Ryan Albertson, represented English at the relevant time of his employment. (Doc. 171 at 3; Doc. 225 at 2–3).

3.      BNSF staffs its trains by organizing crews into "pools" and "extra boards" at each terminal. Employees can choose which pool or board they want to sign up for, depending on their union seniority and staffing numbers. Until September 2015, there were two pools (each covering a separate rail segment) and one extra board at the Havre terminal. BNSF combined the two pools into a single "grand pool" in September 2015. The extra board remained in place. (Doc. 224 at 6–7).

4.      The extra board consists of a rotating list of conductors who stand ready to staff a train. When a train is ready for departure, the conductor at the top of the board is called to work, and everyone else moves up one slot. Employees on that board are guaranteed to be paid whether they work or not in order to be available 24/7, 365 days a year, subject to certain exceptions such as vacation, personal leave days, and other excuses known as "lay-offs." (System General Notice No. 104, Ex. 510; Tr. 393:9-394:5, 397:19–399:3; 401:22–403:11

(Nagengast)). BNSF pays conductors on the extra board to be on call. (Tr. 165:15-18 (Welter)). The workers on the extra board perform a variety of types of work as needed. The extra board workers provide relief starts (staffing when the original crew bumps up against the hours of service limitations), can work trains, and may fill in for general pool service. (Tr. 402:1–403:5). (Doc. 225 at 3).

5.      Conductors face significant scheduling challenges as a part of their work. Conductors receive estimated times to report to work and can update their projected work times by using a computer, scheduling app, or by calling a company number. (Tr. 21, 562-563). Despite the availability of these resources, the actual time that work begins can differ significantly from those projections due to circumstances such as train traffic, weather, speed restrictions, track damage and repair, conditions affecting the number of extra board conductors needed at a given time, and whether people at top of the extra board take vacation or lay off. A quarter of the time, 25% of the time, the difference between the projected time and the actual time exceeds plus or minus three hours and not infrequently, exceeds ten hours. (Tr. 36, Beasley-Coke at 19). (Doc. 224 at 8).

6.      Conductors' unpredictable work schedules can result in unpredictable sleep schedules and related fatigue. Consultants and conductors alike have raised the challenges of fatigue with BNSF management, including management at the Havre terminal. For example, one internal report prepared by consultants at

Behavior Science Technology, Inc. found that unpredictable scheduling "causes fatigue and distractions for the crews, increasing the risk for error and injury." (Ex. 21-4 at 14). (Doc. 224 at 7–11).

7.     BNSF policy allows conductors on the extra board to "lay-off" or remove themselves from the top of the extra board call list for certain reasons before they have been called. Once a conductor has been called to work, however, the conductor cannot lay off without facing disciplinary action. Circumstances can arise where conductors at the top of the extra board lay off, a train arrives early, and someone low on the extra board suddenly can be called to work late at night and without adequate rest. The newly-shifted conductor would face the choice of potential discipline or to work while fatigued. Evidence presented at trial provided examples of such circumstances. (Doc. 224 at 11–15).

8.     Collective bargaining agreements ("CBAs") generally govern a conductor's work on the extra board. The relevant CBA in this case would be the Crew Consist Agreement Between Burlington Northern Railroad and United Transportation Union, dated May 20, 1993. BNSF unilaterally implemented a progressive disciplinary policy known as the Policy for Employee Performance Accountability ("PEPA Policy"). The PEPA Policy provides that BNSF can terminate an employee for five standard violations of its disciplinary policy within

12 months. The terms of the PEPA Policy were not subject to negotiation under the CBA. (Doc. 225 at 4–15).

9.      A separate CBA, the Memorandum of Agreement Between The Burlington Northern And Santa Fe Railway and United Transportation Union ("UTU"), provides an alternative method of disciplinary procedure. So-called "alternative handling" provides a method to allow BNSF employees to avoid the accrual of standard violations that could lead to dismissal. BNSF unilaterally implemented an interpretation of the policy to exclude "willfull violations" of company policy from the agreement. BNSF's interpretation letter was not subject to negotiation. The letter noted that "attendance-related policy violations will not be subject to automatic" alternative handling. It remains in the discretion of management when to apply alternative handling to an employee who has violated BNSF's attendance policy. (Doc. 225 at 15–16).

10.     From September 15, 2015, to January 20, 2016 and June 23, 2016, through August 15, 2016, English elected to join the extra board at the Havre terminal. (Crew History records, Exs. 506, 507; Tr. 573:11-19).

11.     BNSF terminated English on September 14, 2016, for five standard violations of BNSF's disciplinary rules within a 12-month period which, under BNSF's disciplinary policy, allows termination. (Doc. 224 at 2; Doc. 225 at 15).

12.     On April 16, 2018, English sued BNSF and two of its officials in Montana state court. He alleged the defendants had terminated him in violation of state tort law, primarily violating §39-2-703, MCA, that makes railroad companies liable for all damages suffered by an employee due to negligent or willful mismanagement. (Doc. 224 at 2).

13.     On May 21, 2018, BNSF removed to federal court on the ground of complete diversity. (Doc 171 at 4). The parties agreed to a trial without a jury. English dismissed the two BNSF officials and the suit proceeded solely against BNSF. (Doc. 224 at 2).

## II.     English's Violations of PEPA Policy

### A.     First Violation: December 3, 2015

14.     BNSF accused English of a violation of BNSF attendance guidelines for the three-month rolling period between August and October 2015. The attendance guidelines require employees to be available for duty on 75 percent of weekend days and 75 percent of weekdays over each three-month rolling period. (Doc. 224 at 20).

15.     English does not contend that BNSF committed mismanagement on this infraction. English concedes full fault on this infraction. (Doc. 224 at 20; Doc. 225 at 65).

16.     The Court finds English fully at fault for this violation.

**B.      Second Violation: December 12, 2015**

17.      English testified that he came home from a barbeque about midnight

on Saturday, November 21, 2015. He went to bed to prepare for his shift projected

to start 10 hours later. BNSF called English at approximately 1:06 AM on Sunday,

November 22, 2015 to report to duty at 2:20 AM that same morning. English

accepted the call to report to duty. English then fell back asleep. (Doc. 224 at 18–

19; Doc. 225 at 21–22).

18.      English testified that by the time he awoke, he was late for work. He

still left for work and arrived at work 25 minutes late. The train had not yet

departed the station. English testified that he turned off his cell phone and began to

complete his paperwork at the station. The on-duty trainmaster called another

conductor because they could not reach English, so English received a disciplinary

notice for failure to report. (Doc. 224 at 18–20).

19.      BNSF presented evidence that English failed to notify BNSF that he

was running late until 40 minutes after he was supposed to be on duty. Before

English reported to work, the trainmaster on duty attempted to call English twice,

but was not able to reach him. The trainmaster called the crew office to ask for

advice on how to handle the matter, and the trainmaster ultimately reported English

as a no-show. The crew calling office removed English from the board and called a

replacement conductor on the list. (Doc. 225 at 21–22).

7

20.     Internal emails show that English explained what happened to his supervisor, trainmaster Jody Mills, and that Mills granted English alternative handling on the infraction. (Tr. 240-242, Exh. 556-5). The terminal manager Cody Parker revoked that offer of alternative handling in an email chain, noting "this is an automatic Level S . . . Jody was unaware of this." (Tr. 240-241, Ex. 556-6). A Level S violation is an infraction not eligible for alternative handling and can subject an employee to termination. Further evidence, including testimony of union officials and a BNSF employee directly involved in the discipline, indicates that "no show" violations tended to be treated through more lenient alternative handling. English's discipline represented the first application of a new and arbitrary policy change. BNSF notified the union representative to "get the word out to everyone else as it will be a Level S going forward." (Emails, Ex. 27-10). In recognition of that policy change, BNSF offered English to downgrade the Level S violation to a standard violation if English accepted a waiver of any investigatory rights. BNSF's offer also excluded the possibility of alternative handling. English accepted the waiver. (Doc. 224 at 20–26; Doc. 225 at 25–27).

21.     The PEPA Policy lists an "unauthorized absence" as a Level S violation. The PEPA Policy does not define unauthorized absence to include an employee who arrives at work late. BNSF officials could not recall any previous

application of an "unauthorized absence" Level S violation to someone who arrived at work late. (Doc. 224 at 20–26).

22.     The Court finds that English bears some responsibility for his tardiness and failure to notify BNSF that he would be late. BNSF's arbitrary revocation of alternative handling, its offer of limited remedies that did not include alternative handling, its change in policy on the treatment of no-shows, and its categorization of English's tardiness as a no-show, however, together constituted the predominant causes for English's discipline. BNSF justified its revocation of alternative handling through an arbitrary interpretation of a unilateral policy that was not subject to bargaining. BNSF's new interpretation conflicts with prior applications of the policy to tardy employees. BNSF management further failed to find English when he arrived late to work and classified his tardiness as an unauthorized absence. The Court finds English 20% responsible, and BNSF 80% responsible for this violation.

## C.     Third Violation: January 27, 2016

23.     On January 13, 2016, English was listed on the extra board. (Crew History Records, Ex. 507). English received a call at 10:46 PM to report to duty at approximately midnight. He answered the call and laid off on call. A "layoff on call" occurs when an employee does not lay off ahead of a call to duty for a reason such as illness, and instead declines to accept an assignment *after* they have been

9

called to duty by BNSF's crew calling system. (English Dep. (7/28/2020) 34:8-16; McDaniel Dep. 62:23-63:6; & Albertson Dep. 42:10-12).

24.     English testified that he got off work earlier in the day, had checked his projected call time, and planned to go to bed with enough time to rest before his projected time. When he went to bed, BNSF unexpectedly called him to work. He did not feel safe to report, so he decided to lay off on call. (Doc. 224 at 27).

25.     BNSF presented Crew History records that showed English's last work day took place five days before his call to service. (Crew History Records Ex. 507; English Dep. (7/28/2020) 148:8-16). BNSF further presented evidence that when train employees reject a call to duty, they are routed to a human crew caller who asks them the reason. (Tr. 596:7–597:9 (Robinson)). BNSF records show that the caller coded a family emergency as English's reason for laying off on call. (Crew History Records, Ex. 507). English contested this recorded reason, and he does not remember a family emergency. (Tr. 293:17-19; English Dep. (7/28/2020) 146:6-10; Preston Dep. 33:2:18).

26.     BNSF served English with a notice of a disciplinary hearing regarding his lay off on call. This notice included language indicating that English remained eligible for alternative handling. (Ex. 31). A subsequent letter dated January 20, 2016, stated that English took an investigatory waiver rather than alternative handling, so his conduct constituted a standard violation. (Ex. 554-89). Internal

emails again showed that BNSF originally offered alternative handling to English. These same emails demonstrate that English accepted that disposition, but trainmaster Parker intervened. Trainmaster Parker sent an email to Director of Administration for the Montana Division Rick Stauffer in which he questioned English's eligibility for alternative handling. Director Stauffer responded that English was eligible, but BNSF could deny alternative handling based on English's second infraction the previous month. (Ex. 556-14). BNSF revoked alternative handling, and English took a waiver. (Doc. 224 at 27–30).

27.     The Court finds that BNSF bears full responsibility for this violation due to the unavailability of alternative handling based on the arbitrary denial of alternative handling in the second violation.

### D.     Fourth Violation: September 13, 2016

28.     On August 2 and 3, 2016, English was on the extra board. BNSF records show that English received a push alert to his cell phone at 2:22 PM on August 2 that projected him to work at 6:12 PM on a train. (Ex. 53-4). Two hours later, his call time was moved back to 10:00 PM and his anticipated train had changed. (Ex. 53-4). English again checked his projected lineup at 9:34 PM, and his projected call time had moved to 2:00 AM. (Ex. 53-4). English checked his projected lineup again at 12:28 AM, and the system showed a 4 AM on-duty time. (Ex. 53-4; Tr. 572:24-19 (Gilgannon)). (Doc. 225 at 47).

11

29.     BNSF records further show that the calling system placed three calls—at 1:50, 1:52, and 2:05 AM Mountain Time—to English's mobile phone. (Ex. 11; Tr. 591:2–593:15 (Robinson)). An hour later, English called a trainmaster to be marked up on the extra board again. (English Dep. (8/20/2019) 185:16-186:20, 191:5-21; Ex. 53-4). (Doc. 225 at 47).

30.     English testified that he plugged in his cell phone next to his bed and went to sleep as he waited for a call. (Tr. 260). English further testified that the cell phone did not ring as he had expected. At 3:16 AM English called the on-duty trainmaster Christopher Groeling to see why he had not been called and to be marked up on the extra board again. (Tr. 260). At his deposition, trainmaster Groeling could not remember what was discussed. (Groeling Dep. at 50). (Doc. 224 at 31–34).

31.     BNSF served English on August 5, 2016, with a notice of investigation concerning the alleged missed calls. (Ex. 3; English Dep. (8/20/2019) 168:7-24). The investigations took place on September 1, 2016. (Investigation Transcript, Ex. 502). BNSF presented evidence of print-out records of the dates and times that the calls had been made on August 3, 2016. (Investigation Transcripts, Exs. 502 & 503). English argued that he had not heard his phone ring and presented Verizon phone bills that did not show that he received a call from

BNSF's crew calling system. (Exs. 502 and 503). The BNSF conducting officer found in favor of BNSF. (Doc. 224 at 51).

32.    A witness from Verizon testified that a Verizon bill would not reflect an unanswered call or call that was answered by voice mail. (Tr. 269:19-270:2; Verizon Corp. Dep. at 11:7-17; 13:18-23: 13:25-14:21). The same witness testified that there remain many other reasons a call may not go through to the subject phone. (Verizon Corp. Dep. at 36–42). This mixed evidence muddles the probative value of the Verizon bill evidence as well as the BNSF phone records.

33.    In discovery, English learned that BNSF retains audio recordings of its automated calls to employees, as well as phone calls to trainmasters. (Tr. 595, 600). BNSF held in its sole control at the time of the investigation an audio recording of its calls to English as well as English's call to trainmaster Groeling. BNSF no longer possesses the recordings that were in its sole control. Such recordings would have provided conclusive evidence regarding the status of those automated calls as well as the purpose and content of the call with trainmaster Groeling. BNSF has produced such recordings in previous disciplinary hearings. (Tr. 600, 606, Preston Dep. at 46–47, Beasley-Coke Dep. 62–64). (Doc. 224 at 38–39).

34.    The Court finds that although there remains mixed evidence on the responsibility for this violation, BNSF bears the vast majority of responsibility for

its failure to produce conclusive audio evidence during the course of its investigation. Those recordings, fully within BNSF's control, would have provided absolute clarity regarding the status of automated calls to English and the subject of English's call to trainmaster Groeling. The Court finds English 20% responsible, and BNSF 80% responsible for this violation.

### E.  Fifth Violation: September 14, 2016

35.     English took vacation on August 13 and 14, 2016, to attend the Rockin' Rivers Concert in Three Forks, Montana. The concert was still going on when English's vacation ended at midnight starting August 15, 2016. At 12:36 AM, BNSF placed English at the top of the lineup for a train leaving Havre at 1:21 AM. English missed the phone call that called him to work. English could not have made it to Havre in time for work even if the call had gone through. (Doc. 224 at 34–36; Doc. 225 at 48–49).

36.     This alleged violation occurred while the investigation of the Fourth Violation remained pending. BNSF scheduled an investigatory hearing in the Fifth Violation set for the same day as the Fourth Violation investigatory hearing. (Doc. 224 at 36; Doc. 225 at 49).

37.     English does not contend that BNSF committed mismanagement on this infraction. English concedes full fault on this infraction. (Doc. 224 at 34–36).

38.     The Court finds English at full fault for this violation.

### III.     Damages to English

#### A.     Loss of Income

39.     English's 2015 combined earnings and benefits were $116,529. (Exs. 42-1, 46).

40.     English's 2016 combined earnings and benefits through the date of his termination were $93,997. (Exs. 42-14, 46).

41.     The Court finds that English is most likely to find employment in the carpentry or construction industries based on his work history and his deep connections in Havre that demonstrate that he would not seek employment elsewhere. English presented evidence from the Montana Bureau of Labor Statistics Information Wage Rates by Occupation that showed construction workers earn approximately $40,000. (Tr. 285, 669–70, 674). BNSF called a vocational rehabilitation expert who testified that English's earning capacity as a carpenter is $50,102. (Tr. 666:1-2 (Jantzen)).

42.     English argued that had he not been terminated he would have worked until at least age 60 when he would have been eligible for retirement. That would represent slightly more than 15 additional years of service. BNSF argued that English would not have completed another year of service without termination. BNSF presented evidence of significant issues with English's job performance throughout his career at BNSF. The Court finds this evidence demonstrates that

English's dismissal only somewhat reduced his work-life expectancy as a conductor. His employment record demonstrates a long history of attendance-related standard violations. In 2016, English still had until November before his admitted attendance guideline violation would no longer count under PEPA. He had two missed calls in his last month of employment. Even with potentially four standard violations on his record, English nevertheless gambled by attending the Rockin' the Rivers concert on August 15, 2016. It is hardly clear that English would have been violation-free before November 2016 or otherwise that he would not have encountered similar attendance issues under PEPA in the future. In addition, the evaluation of any future violation to determine whether dismissal is appropriate would include a review of his entire disciplinary history. The Court must weigh all the evidence presented to determine where between 1 year and 15 years English's projected future service would fall. (Tr. 714:15–715:2 (Cargill)). (Doc. 225 at 60).

43.     The Court finds that English would have been employed for seven years beyond his termination. This term represents the Court's attempt to balance English's claim of wanting to work until age 60 with his work history at BNSF that reflects repeated problems during the course of his employment. The Court finds that following his termination, English could have found employment beginning

the following calendar year in construction or carpentry based on his background and skillset with a salary of $45,000.

### B.    Mental Anguish, Distress, and Reputation Loss

44.    English alleges that he suffers ongoing distress related to his dismissal. He described Havre as a small and close-knit community. English worries that everyone views him as "worthless" and a "big loser." (Tr. at 279–81). He presented no evidence at trial regarding his reputation in the community before his dismissal and he presented no evidence at trial of any change in his reputation in the community after his dismissal.

45.    English testified that stress makes him feel "chest pains, sweats and body aches." (Tr. at 279–81). English admitted at trial that he was not taking any medication for depression and had not been prescribed counseling or seen a doctor for emotional distress. (Tr. 347:24-348:2). English suffered anxiety and panic attacks after his military service in 2005 or 2006, but he did not take medication for that anxiety. (348:6-11). English has found alternative employment, and has continued his recreational activities, which together seem to alleviate his distress. (Tr. 348:24–349:1; English Dep. (8/20/19) 7:25-8:11; 22-:4-14; 220:18-23; 236:4-14; 240:22-2241:9; English Dep. (7/28/20) 164:24-165:7).

## CONCLUSIONS OF LAW

From the foregoing findings of fact, the Court makes the following conclusions of law:

### I.     Jurisdiction and Venue

1.     The Court retains jurisdiction based on diversity jurisdiction. *See* 28 U.S.C. §§ 1332, 1441(b) and 1446. On May 21, 2018, BNSF removed to federal court on the ground of complete diversity. (Doc 1). English is a citizen of Montana, and BNSF is a citizen of Delaware (its state of incorporation) and Texas (its principal place of business). (Doc. 1 at 3). The matter involves a claim greater than $75,000, so it also meets the controversy requirement for diversity jurisdiction. (Doc. 1 at 3).

2.     The District of Montana represents a proper venue because a substantial part of the events or omissions giving rise to the claim occurred in the District of Montana. *See* 28 U.S. Code § 1391.

### II.    Preemption

3.     The Court previously denied a Motion for Summary Judgment and a Motion for Reconsideration in which BNSF argued that the Railway Labor Act ("RLA") and other federal laws preempted English's claims under Montana's Railroad Mismanagement statute. (Docs. 77, 163). The Court again concludes that federal law does not preempt the Railroad Mismanagement statute.

4.      The Ninth Circuit clarified that "the crucial inquiry in determining whether a cause of action under state law is preempted by the RLA is whether the 'state-law claim is dependent on the interpretation of a CBA.'" *Wolfe v. BNSF Ry. Co.*, 749 F.3d 859, 864 (9th Cir. 2014) (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 262 (1994)).

5.      English alleges that BNSF's scheduling system and the accompanying threat of discipline or firing constitutes an intentional and dangerous act of mismanagement that caused or substantially contributed to his firing. (Doc. 62). Those claims do not require interpretation of the CBA because the record shows that they involve specific discretionary discipline decisions and scheduling notice policies that fall outside collective bargaining. BNSF alone sets these policies. Such a claim would fall under the "very broad language" of Montana's Railroad Mismanagement statute. *Winslow v. Montana Rail Link, Inc*., 302 Mont. 289, 294 (2005) (citing MCA § 39–2–703).

### III.    Montana's Railroad Mismanagement Statute

6.      Montana's Railroad Mismanagement statute provides that a "corporation operating a railway or railroad in this state is liable for all damages sustained by any employee . . . in consequence of [its] neglect . . . or . . . in consequence of [its] willful wrongs, whether of commission or omission . . . when such neglect, mismanagement, or wrongs are in any manner connected with the use

19

and operation of any railway or railroad on or about which he is employed." MCA § 39–2–703(1).

7.     The Montana law confers on railroad employees the "right not to be negligently injured" by their employer—a right that includes personal injuries as well as wrongful firing. *Wolfe*, 749 F.3d at 876. Courts repeatedly have applied this unique statute in termination cases. *See, e.g.*, *Winslow*, 302 Mont. at 294–95; *Wolfe*, 749 F.3d at 864. The right of railway employees to sue based on negligence or mismanagement resulting in termination may be unusual, but that right remains "undoubtedly recognized in Montana." *Wolfe*, 749 F.3d at 864.

8.     Montana's Railroad Mismanagement statute "provides for a cause of action for mismanagement." *Haux v. Mont. Rail Link, Inc*., 322 Mont. 456, 460 (2004). The language of the statute, though expansive, "is clear, unambiguous, direct and certain. . . . The plain meaning of the language . . . requires that a railroad be held liable for mismanagement." *Id*.

9.     The same burden of proof applies in a civil action regardless of whether the finder of fact is a judge in a bench trial or a jury. *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994). When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means the Court must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

20

10.    A negligence claim requires proof of four essential elements under Montana law: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *Wiley v. City of Glendive*, 900 P.2d 310, 312 (Mont. 1995).

11.    BNSF owed a duty to English based upon Montana's Railroad Mismanagement statute. (Conclusions of Law, *supra* ¶¶ 6–8).

12.    BNSF breached that duty when it dismissed English based on the following: its unilateral and arbitrary revocation of alternative handling; its decision to deny alternative handling based on that previous infraction; and its failure to present audio evidence in its sole control. (Findings of Fact, *supra* ¶¶ 11, 17–34).

13.    BNSF caused the breach of duty through its own actions and termination of English. (Findings of Fact, *supra* ¶¶ 11, 17–34).

14.    English experienced damages in the form of lost past income and lost future income. (Findings of Fact, *supra* ¶¶ 39–45).

**IV.    Emotional Distress and Damage to Reputation**

15.    A stand-alone claim for emotional distress under Montana law can arise in circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent or intentional act or omission. *See Sacco v. High Country Independent Press, Inc.*, 271 Mont. 209, 238–39 (1995). The elevated standard adopted in *Sacco* applies

21

only when a plaintiff pursues an independent, stand-alone claim of negligent or intentional inflection of emotional distress. *Lorang v. Fortis*, Ins. Co., 192 P.3d 186, 223 (Mont. 2008). Here English asserts emotional distress as an element of damages that have resulted from BNSF's violation of Montana's Railroad Mismanagement statute. English must demonstrate only that he suffered emotional distress damages arising from BNSF's violation of Montana's Railroad Mismanagement statute. *Vortex Fishing Systems, Inc. v. Foss*, 38 P.3d 836, 841 (Mont. 2001).

16.    The question of whether English suffered emotional distress damages related to BNSF's violation of the Montana Railroad Mismanagement statute falls to the factfinder. *Lorang*, 192 P.3d at 224. A review of recent Montana cases on emotional distress damages provides helpful context. The Montana Supreme Court determined in *White v. Longley* that the plaintiffs had presented sufficient evidence to support an award of emotional distress damages arising from their claims of negligence and constructive fraud when they testified to the "stress, anxiety and depression" that they had suffered from dealing with a "house-building fiasco." 244 P.3d 753, 763 (Mont. 2010). The court noted that the plaintiffs had to live apart when the husband "had to abandon retirement and return to California to work again." *Id.* This evidence substantiated the trial court's determination that

22

"the Whites suffered greatly as they watched their dream turn into a nightmare."
*Id.*

17.     Courts often look to physical manifestations of emotional distress to
buttress an award of compensation of emotional distress damages. *See Czajkowski
v. Meyers*, 172 P.3d 94, 102 (Mont. 2007). These physical manifestations can take
many forms, including gastrointestinal disorders, elevated blood pressure, hair loss
or ulcers. *Id.* at 101 (citing *Seltzer v. Morton*, 154 P.3d 561, 593 (Mont. 2007)). A
court also should consider the intensity and the duration of the emotional distress
as factors in determining its severity. *See May v. ERA Landmark Real Estate Co*.,
15 P.3d 1179, 1186 (Mont. 2000) (citing Restatement (Second) of Torts, § 46, cmt.
J).

18.     The Montana Supreme Court affirmed an award of emotional distress
damages in *Czajkowski*. 172 P.3d at 102. The victims testified to being subjected to
years of verbal abuse and surveillance by a neighbor in a property dispute. *Id.* at
101. Other neighbors who had witnessed the behavior corroborated the victims'
testimony. *Id*. The trial court found that one victim "was fearful, lost countless
hours of sleep, lost weight . . . and her hands would shake." *Id.* The other victim
"suffered emotional distress as a result of [defendants'] approximately four (4)
year campaign of vulgar, abusive language and conduct." *Id.* The defendant's
conduct included "an unrelenting barrage of obscene gestures, vile verbal abuse in

23

which [defendant] employed the coarsest and most offensive words in our

language, and on-going surveillance of their every outdoor activity for over four

years." *Id.*

19.    The record included the following finding by the trial court:

[t]he stress of [the defendant's] continuous abuse caused both of the
[victims] to suffer severe emotional distress that no reasonable person would
be expected to endure. . . . Day in and day out, the [victims] were unable to
quietly enjoy their homestead without being flipped off or having abusive
names screamed at them such as "c—t, mother f-cker, f-cking asshole,
stupid asshole, and son-of-a-bitch." No reasonable person should be
expected to endure such torment and emotional distress.

*Id.* at 102; *see also Vortex Fishing Systems*, 38 P.3d at 841 (finding testimony in

the form of having difficulty finding work, losing sleep given his economic

hardship, forcing plaintiff to move in with relatives, being hounded by collection

agencies, having to borrow money, and having to sell a car to afford food

supported plaintiff's $2,500 emotional distress award).

20.    English's evidence regarding his alleged emotional distress arising

from BNSF's violation of Montana's Railroad Mismanagement statute falls well

short of the injuries suffered in comparable cases. The record here contains little of

the type of evidence presented by the plaintiff in *Vortex Fishing Systems* to support

an award of $2,500 in emotional distress damages awarded in that case—let alone

the $250,000 sought in this case. *See Vortex Fishing Systems*, 38 P.3d at 841.

English testified that stress makes him feel "chest pains, sweats and body aches."

(Tr. at 279–81). English admitted at trial, however, that he never took any medication for depression, that he had seen no doctor to address any emotional distress, and that no doctor had prescribed counseling for emotional distress. (Tr. 347:24-348:2). English suffered anxiety and panic attacks after his military service in 2005 or 2006. He never took any medication to address that anxiety. (348:6-11). English has a new line of work and he has continued his recreational activities. His new work and his renewal of recreational activities seem to alleviate his distress. (Tr. 348:24–349:1; English Dep. (8/20/19) 7:25-8:11; 22-:4-14; 220:18-23; 236:4-14; 240:22-2241:9; English Dep. (7/28/20) 164:24-165:7). Conversely none of BNSF's actions in adjudicating English's employment issues, although violative of Montana's Railroad Mismanagement statute, rose to the level of misbehavior catalogued in *White* or *Czajkowski*. English has failed to present evidence of emotional distress arising from BNSF's violation of Montana's Railroad Mismanagement statute to support an award of damages.

21.     With regard to English's claim for damage to his reputation arising from BNSF's violation of Montana's Railroad Mismanagement statute, the Court deems it prudent, once again, to seek guidance from Montana cases that have affirmed an award of damage to reputation. For example, the plaintiff in *Seltzer* had "maintained a sterling reputation in both the local and national Western art community which he had developed over the course of forty years." *Seltzer*, 154

P.3d at 590. The plaintiff provided the following testimony at trial to support his claim of damage to reputation: "I'd worked hard all my life to become an expert and competent [as an authenticator and appraiser] and a great painter. And I'd taken every opportunity to become involved in authentication work regarding O.C. Seltzer and I'd just made a lifelong study of it." *Id.* The plaintiff's reputation in the art community had led to people, art galleries, and auction houses throughout the United States, including prominent auction houses such as Sotheby's and Christie's, asking him to perform authentication and appraisal work. *Id.* The plaintiff also had sold his own paintings in virtually every state in the United States. *Id.*

22.     The defendants' actions in filing a defamation lawsuit against Seltzer based on his alleged filings of false statements in his repeated refusal to withdraw his letter in which he stated that his grandfather, O.C. Seltzer, rather than Charlie Russell, had been the author of defendants' painting "Lassoing a Longhorn," caused serious damage to Seltzer's reputation. *Id.* The Montana Supreme Court noted that news of defendants' accusations against Seltzer "spread throughout the local community at large, as well as the local and national art community. True West Magazine and the Main Antique Digest both ran articles regarding the lawsuit, as did the leading newspaper in Seltzer's hometown, the Great Falls Tribune." *Id.*

23.     The news reached potential customers of Seltzer's authentication and appraisal services and his own artwork. Seltzer testified that the amount of authentication work that he receives serves as a function of his reputation in the art world. *Id.* Seltzer testified at trial that he had performed hundreds of authentications in the years before defendants had filed suit. *Id.* By contrast, Seltzer testified that he had received only one authentication request in the three years after the filing of the lawsuit. *Id.*

24.     Seltzer also presented testimony of other witnesses to support his claim of damage to his reputation. The former President of the Board of C.M. Russell Museum, testified, based on his involvement in the annual C.M. Russell Art Auction and discussions with art collectors and members of the museum's National Advisory Board, that Seltzer's reputation had been tainted as a result of the allegations made in the underlying lawsuit. Similarly, Seltzer's wife testified, based on her communications with many individuals in various groups in the Great Falls community and at the C.M. Russell Art Auction, that defendants' defamation lawsuit had damaged Seltzer's reputation because it had caused these people to question Seltzer's integrity and honesty. *Id.*

25.     This evidence led the trial court to make the following finding:

Over his lifetime, Steve Seltzer developed, in the Great Falls community and in the western art community locally and nationally, an impeccable and highly respected reputation for general honesty, as a quality commercial artist, as the foremost expert and authenticator of O.C. Seltzer art, and in

27

relation to his association with the prestigious C.M. Russell Art Auction. As a result of a few publications and word of mouth in the western art world and in the local community, word of the [defendant's] lawsuit damaged Steve Seltzer's reputation in western art circles and in the local community.

*Id*.

26.     English worries that everyone views him as "worthless" and a "big loser." (Tr. at 279–81). He presented no evidence at trial, however, regarding his reputation in the community before his dismissal. And he presented no evidence at trial of any change in his reputation in the community after his dismissal. English presented no evidence at trial by other witnesses to corroborate his concerns that people in the community of Havre view him as "worthless" and "a big loser." In fact, BNSF provided evidence of English's reputation in the community before his dismissal—evidence that displayed a community reputation that would remain unchanged by a dismissal for attendance violations. (Tr. at 418–19). English merely speculates that the uncertainty surrounding his dismissal by BNSF could lead some in the community to think him guilty of "moral turpitude" rather than technical violations of employment rules no more serious than a "parking ticket." (Doc. 231 at 5).

27.     English's speculation and his own testimony fail to support any claim that his dismissal from BNSF has altered or damaged his reputation in the community. The Court declines to award English any damages for loss of

reputation based only on his own speculation about damage to his reputation. *Cf. Seltzer*, 154 P.3d at 590–91.

### V.    Comparative Fault

28.    According to Montana's comparative fault statute, a person seeking "tort damages" is entitled to recovery "if [his] contributory fault was not greater than the fault of the defendant." §27-1-702, MCA. Therefore, English's comparative fault must be considered.

29.    Based upon the Court's allocations of responsibility on each of the violations, BNSF retains 52% responsibility while English retains 48% responsibility for his own termination. (Findings of Fact, *supra* ¶¶ 16, 22, 27, 34, 38).

### VI.    Punitive Damages

30.    The Court finds that English failed to present clear and convincing evidence that BNSF engaged in conduct that would rise to the level of "actual fraud," "actual malice," or that BNSF supervisors and employees made "a representation with knowledge of its falsity" or "conceal[ed] a material fact." Mont. Code Ann. §27-1-221.

31.    The Court finds that the evidence presented by English cannot meet the standard set in Montana for punitive damages.

29

## ORDER

Accordingly, IT IS HEREBY ORDERED, under Federal Rule of Civil Procedure 58, that the Clerk of Court enter amended judgment by separate document in favor of the Plaintiffs as follows:

The plaintiff, Frank English, recover from the defendant, Burlington Northern Santa Fe Railway Company, the following costs and post judgment interest as provided by law:

| | |
|---|---|
| Loss of earning capacity (past): | $ 22,532 |
| Loss of earning capacity (future): | |
| (116,529 – 45,000) * 7 years = | $ 500,703 |
| Mental anguish, distress, reputation loss: | $ 0 |
| Punitive damages: | $ 0 |
| SUBTOTAL: | $ 523,235 |
| Reduction by 48% for comparative fault: | ($ 251,152.80) |
| TOTAL: | $ 272,082.20 |

DATED this 30th day of March, 2021.

Brian Morris, Chief District Judge
United States District Court